Next case on the calendar is United States v. Cureton Mr. Margulis-Numa, you have three minutes reserved for rebuttal, and you can begin whenever you're ready. Mr. Margulis-Numa Thank you very much, Your Honor. May it please the Court, Judge Carney, Judge Bianco, Judge Perez. I represent James Cureton, the defendant appellant in this case. Mr. Cureton was denied effective assistance of counsel because at every turn, counsel failed to take basic steps to ensure his representation, and those steps were taken or failed to be taken without any strategic justification. We know that there was no strategic justification in part because trial counsel promised to take certain steps and indicated to the court he was taking certain steps and failed to do so. For example, in a filing on the eve of trial, he acknowledged that there were witnesses, half-dozen witnesses, that needed to be interviewed. He acknowledged that there needed to be travel because the case, although it was local in Albany, involved incidents all over the United States. In opening statements, he told the jury that the main cooperating witness didn't come to the story until the 10th of his 20th or until halfway into his 20 proffers. But he didn't present any evidence about those proffers. He didn't cross-examine about the proffers. He didn't point out the five proffers that were inconsistent with Norbert Grieger's testimony. So for those reasons, I think we can set aside the idea that these were strategic decisions. What these were were a failing of investigation on the eve of and the run-up to and, in fact, during the trial that was caused by a myriad of factors. I have the utmost respect for this trial counsel. I don't know of any other errors he's made in other cases. My quarrel is with his conduct in this particular case. And what happened was that he was overwhelmed with a Curcio motion, several pretrial motions, tranche after tranche of discovery. If you just look at that last month of May and June of 2016 on the docket sheet. And 3500 that finally revealed the government's theory, which was overwhelming if it could have been proven, that we know of prior knowledge on count one because the defendant went in holding a spray bottle to a drug meeting. It was a hearing. You have a very experienced defense counsel. One of the most experienced defense counsel you could possibly have in these types of cases, right? Absolutely. All right. These concerns were raised. You have a district court who actually has a hearing to have the defense counsel explain these things, right? No. Well, the hearing was very constrained. It was very narrow to the one question. And whenever I tried to stray in cross-examination away from that, all the hearing was pointed at was determining what was the statement that the client, the privilege statement, that the client made to the lawyers in advance of the trial. And that statement, according to, I mean, if you accept, so the judge made a finding that he said he had the spray bottle in his hands after the murder. That was at odds with his other public statement from a few weeks earlier on the record, right? So he, the client couldn't reach his lawyer for a month and in desperation filed a pro se brief. Let's take a step back. On the strategic decision about the spray bottle, why can't a defense lawyer say we have bigger issues than the spray bottle? We have, you're making a face at me. I apologize. I'm sorry. Your client allocated to having a gun at 1.30 p.m. on the day of the murder in state court, right? Right. That's, to me, a pretty big thing for a defense counsel overcoming a trial, right? Trying to argue that he didn't know there was about to be a murder, right? Or is that not significant? Well, people bring guns to drug meetings and drug transactions all the time without killing anyone. Why would you bring a spray bottle? But he also conspired to get the victim's romantic partner out. And he also told a witness not to go into the building before. I mean, I guess my question for you is, do we have to conclude that the spray bottle was the only evidence corroborating the claim that murder was about to take place? Do we have to find that in order to support you? Both of those actions are consistent with holding a drug meeting. Guys roll in from out of town. They want to talk to their drug seller alone so they get the person out of the building. Having a gun is consistent with going to a drug meeting. Having a spray bottle can only mean one thing. You're going to clean something up, right? And what are you going to clean up? Blood. I mean, it's overwhelming. If you buy it, it's overwhelming testimony. And the point is that – let me just say – sorry. It's okay. Please finish. The evidence is not that strong, according to the jury. They were deadlocked for a while, and then they asked for the spray bottle testimony again, and they acquitted on the conspiracy. So they found Norbert Grieger's statements, his testimony that we planned the whole murder in advance, not to be credible. So given that, everything else could be explained away with competent counsel. I mean, I don't know. I'm sure you read the closings, and it's pretty baffling. But you could have explained all of those other attributes. It's not like he ignored the spray bottle in the closing. He decided to say there was no physical evidence that any cleaning was done. That they went into the apartment right after the murder, and they did a forensic examination. There was no indication of any cleaning agent. Why is that a – again, this is a pretty deferential standard. We're second-guessing a very experienced trial counsel in a very difficult case. He decided that was the better course than to try to argue that various witnesses are lying about the spray bottle. Your Honor, at that point it was too late because he hadn't done the investigation. If he could have brought in Brittany Satterwhite and Bruce Leonard to come and testify. You refer to her statement as exculpatory, and I have difficulty understanding it as that. The fact that she didn't mention in the police report in Albany that she saw or didn't see a spray bottle seems to me really kind of of no moment. I mean, we have all these other elements that the district court went through, and some of which my colleagues have adverted to regarding the time that he acknowledged he had a gun in Albany. And the other factors involving Grigger's known violence, their past together, and his prior murder history and so on. That seemed to me to provide an adequate basis. Spray bottle mentioned or not by Brittany Satterwhite to conclude that he was fully foreseeable, which was the standard, right, that a murder would be committed. So what's wrong in that? Well, a couple things. I mean, first of all, I don't think the jury found it so believable, and that's why there were all these notes and two days of deliberations in a two-day trial, essentially two days of evidence trial. Sorry, I was going to respond to the first thing you said. Oh, which is the police report. So the police report, right, is vague. And that's why you have to do a defense investigation. I called, I personally called, and this is an affidavit of the record, Brittany Satterwhite, and I said, what did he have in his hands when he went in and when he went out? You were there with Braswell, according to this police report. She said, I saw his hands, and his hands were empty. That squarely contradicts Braswell, and more importantly, squarely contradicts Norbert Grigger. If they had done the investigation, they could have done what Judge Bianco just asked. They could have given a closing that said, he didn't have a tray bottle, and that's what the client said on the record before. But still, there was enough in the record, given the plea to attempt to possess a firearm at 130, that needed to be accounted for by defense counsel, potentially going in a different direction. The spray bottle had, there was all kinds of vagueness about whether it was before, whether it was after, who saw what actually when, and whether he had such a bottle. But there were all these other elements that suggested that he was fully aware, or it was reasonably foreseeable to him what was going to happen. The spray bottle or not doesn't exculpate him. Again, the jury focused on the spray bottle, and it's not that it would exculpate them. The standard here is a reasonable probability that the outcome would have been different if he had adequate counsel. And I submit to you that it was a close enough case. We know that from the acquittal on count three, and from the jury notes, that it was a close enough case that without the spray bottle, they would not have found prior intent. But all she was in a position to say was that she didn't mention it at the time she was interviewed. And that, I mean, I guess when you talked with her some ten years later or whatever. Almost, yeah. Right? Yeah. Eight, seven, yeah. She was clear with you that she saw his hands and did not see a spray bottle. She would have. And that would have met the people's, I mean, the government's evidence that he had, the two witnesses who said he did bring in a spray bottle. And they said that he was carrying it. Let me just ask you, assuming we don't question the district court's finding that your client told the lawyers that he did have the spray bottle walking out, why wouldn't there be a potential ethical issue, a defense lawyer putting on affirmatively a witness, swearing under oath that she saw no spray bottle in his hand leaving the apartment when their client told them he had a spray bottle? Why is that not an ethical dilemma for an attorney? They were unable to nail down when that statement was made. Which statement? The statement from Curitin to the attorneys, I had a spray bottle after the murder. And the fact is. That he had the spray bottle not walking out of the apartment at some other time after the murder? No, no, no, no. What do you say? Sorry. I've been trying to spit this out. There is a pro se brief on the record from two months before the trial where Curitin can't reach his attorneys. And he says, I was questioned by the FBI about the spray bottle. And I didn't know what they were talking about. And they pushed me to remember. And I said, well, if anyone had a spray bottle, it must have been Norbert Grigger. So he has denied publicly having a spray bottle. And then they're saying, well, he privately told us that. That's not a problem? The district court found them credible. If he privately told them, I had the bottle. No matter what he said to the FBI. The tensors know the truth from their own client. They're going to put affirmative proof. It's one thing to just hold the government to their burden of proof. It's another thing to put on a witness who's going to contradict something truthful that their client told them. I don't accept that the attorneys knew one statement by their client was true and one was false. One is exculpatory and one is inculpatory. And I don't think they explored it. But in this scenario, how is it clearly erroneous for the district court to reach that conclusion? So look, that's not a battle I really want to fight. Because it's such a deferential standard. It's erroneous because it doesn't, because, I mean, reading the transcript, the timing of the statement is vague. And it becomes a self-serving affidavit by the trial lawyer that is not believable. It's also, it's a version of events that came up only, I mean, they dance around it in the affidavits. The district court found it believable, right? Yes. Yes. All right. Thank you. You have three minutes in rebuttal. Thank you. What did I do? Bring it in. All right. Mr. Weintraub. Good morning and may it please the court. Benjamin Weintraub for the United States. And I'm joined by Assistant United States Attorney Jennifer Sasso, who tried the case in front of Judge Ammon. Trial counsel's performance in this case did not fall below the very high deferential objective standard of reasonableness that governs ineffective assistance of counsel claims. And any decisions that trial counsel made that appellate counsel now may disagree with did not prejudice the appellant. Let me ask, I found it very difficult to pin down, reading the declarations and the materials that have been submitted, exactly who trial counsel interviewed. I found it puzzling that they didn't interview, they clearly didn't interview Satterwhite. And they had a phone call with the trial counsel for the state prosecution.  What does the record show? Your Honor, I think the record shows that they interviewed, obviously, Mr. Curitin's wife. They interviewed, essentially, via a phone call, his attorney. And they said that they learned everything that they needed to from his attorney up in Albany. And they also said in the record that every decision about who to interview, that they identified a number of potential people to interview. That they spoke about those people with the defendant. And that they reached strategic decisions as to who to interview after having those conversations with the defendant. Well, they were quite vague. They just said we interviewed where appropriate. But they didn't identify anyone other than the wife and the lawyer. And that struck me as strange, given that, I mean, this led to a three-day trial, a relatively brief trial, on a complicated set of circumstances where his knowledge and the layered different conspiracies presented a fairly complex factual situation. So I'm concerned that we might disagree now about the relative import of the spray bottle. But the evidence of his knowledge was largely circumstantial. And the spray bottle, it may have been that they were unable to pin that down with Brittany Satterwhite. But still, she was a fact witness. Why was it incumbent upon them to interview her? There's certainly no obligation to interview every single potential witness. No, but they didn't interview many people at all. That may be. But defense counsel came up with a coherent defense strategy that would have resulted in an acquittal or could have resulted in an acquittal on counts one through three. They presented that evidence. And they presented that strategy throughout trial. And that specifically was the strategy or the theory that this murder was motivated by a $25,000 side, a murder for hire contract between Keith Sawyer and the defendant, James Curitan, that it wasn't motivated by drugs, be it crack, heroin, marijuana, or cocaine. And they also attacked Mr. Grigger's credibility, thereby trying to- But his argument is you could do all of those things where still try to address the, you know, certainly I think the government agreed that if you had the spray bottle walking into the apartment, that makes his argument that he didn't know what was going to happen much weaker than him just walking out with it. So why wouldn't there be some effort to see if there was a way to attack the testimony that he had the bottle walking in? I guess that would be just a follow-up on Judge Carney's question. Your Honor- If Ms. Satterwhite could in fact say I saw him before the event, before he went in the apartment, he had no spray bottle, certainly that would have been helpful, right? It might have been helpful, but- Might have been helpful? It might have been helpful, but her testimony- Why wouldn't it have been helpful? Because her testimony also would have introduced risks that would have undercut and undermined other arguments that they were making. But he didn't even know what she was going to say because he didn't even interview her. Well, he had- I mean, I think that's what Judge Carney's trouble was. Like, we don't know whether it would have been prejudicial, not prejudicial, and was it incumbent upon the attorney to check and then make a strategic decision? Well, the attorneys knew from their earliest meetings with the defendant that he had told them that he had the spray bottle when he left the apartment. That timeline is actually not unclear, and I would direct the panel to Appendix 1225, where Mr. Rico testified at the evidentiary hearing that in their earliest meetings at the MDC, which would have been in the fall of 2015, well before Mr. Curitin's self-serving pro se motion denied the fact, he told them he possessed the spray bottle. So if you take that admission from Mr. Curitin, teamed with the Albany Police Report, which does suggest that maybe she did not see a spray bottle either before or after, plus the fact that a key aspect of their strategy was to adopt a critical piece of testimony from Curtis Braswell and his half-brother Christopher Melvin, which is that on prior occasions in which they had interacted with Mr. Curitin, he had demonstrated a gentle and kind demeanor and not a demeanor or a penchant for murder, which was critical to establish or to defend against the Pinkerton liability, which was to separate him and his nonviolent nature from Mr. Grigger's repeated history and demonstrations of a violent nature. And so you have the situation where calling Brittany Satterwhite, first of all, conflicts with a potential ethical bounds that Mr. Rico and Mr. Montgomery both testified to that they could not violate because they knew that the testimony would be false or at the very least misleading. Let me interrupt just for a moment there. I mean, the timing, the precise chronology was vague enough about exiting the building, entering the building, whether someone exited twice, Ms. Satterwhite had gone away for a bit. I mean, there was not a really tight chronology of those 15 minutes or 20 minutes, whatever it was. So it seems to me still that it was not so clear that there would have been an ethical bar to introducing some testimony that on first sighting he didn't have the spray bottle because he could have come back later as that story developed, that it was after the killing that he was directed possibly to go down and retrieve the spray bottle from the trunk of the car. It may not be clear or we may not have reached the same decision, but what is clear is that both trial attorneys reached the conclusion that they were ethically stopped from pursuing that testimony. That's essentially a strategic decision that is grounded or informed by ethics, and that is really subject to a very deferential review here. It was a strategic decision and also one that, yes, Judge Bianco, perhaps this pure core testimony that Brittany Satterwhite did not see the defendant enter the apartment with the spray bottle would have been helpful. It comes with tremendous risks as well. There are pros and cons to almost every decision that a trial counsel needs to make throughout every stage of a presentation or litigation from the pretrial investigation throughout trial. And in a complicated case in which there was a lot of evidence, Pinkerton instruction that really bound. Let me ask, other than the spray bottle, what would you say was the strongest evidence adduced to trial to establish that he had prior knowledge that Gregor would kill Brooks? I would point to a number of things. Obviously his admission that he possessed the weapon only about an hour before. Now, appellate counsel says that possessing a weapon can be consistent with a non-murderous. Wasn't it an attempt to possess a weapon also? It was an attempt to possess the weapon, but the testimony from Gregor is that he asked to see the gun, and it happened to be the same gun that Gregor also testified was the gun that Gregor gave Mr. Curitin about a couple months earlier when they went to rob a marijuana dealer in Central Iceland. Nonetheless, we often say that drugs and guns go together, and they're not always used to kill. So it's, you know, there's a weapon, but it doesn't establish necessarily a plan. Sure, potentially not, but you take the presence of a weapon, the calls to Charmaine Richardson to lure him out. Now, as appellate counsel says, you often want to have meetings in private with your drug co-conspirators. Maybe you could have those meetings in private in many places, but you probably want to commit murder in a private place, not in a public place. So a meeting with the victim, Mr. Brooks, that was private and didn't include Montalyn Rose could have happened in a number of places. But a murder, it's best to happen in a basement apartment where they could clean the scene and then leave. The other evidence of foreknowledge that is there is the conversations that Gregor testified to happening the night before, but also his conduct after the fact, the call that he had to Christopher Melvin. Mr. Melvin is not Mr. Gregor. Mr. Melvin testified in a call later that evening that Cureton was laughing about the murder. He said, that's what happens when you mess with people's money. And he had said that on earlier occasions as well to Melvin and Braswell. I mean, that's also consistent with not having foreknowledge in that, you know, that's what happens. No, but I would say the callous and the laughing that he described. He testified that he was laughing and joking. He called him and said, turn on the news. It was as if he was bragging about it. I mean, that is not evidence of somebody who is shook and really distraught by having committed or having witnessed a murder that they had no idea was coming. That's evidence of somebody that knew that it was coming. And that's just specific foreknowledge here, but there's also the general foreknowledge. I would speak to the Pinkerton liability. He had known Grigor for their entire lives, essentially. He had been on multiple trips with him where they had taken guns to drug meetings, including in Texas just months earlier, including in the robbery in Central Islip months earlier. And he knew that Grigor killed people in the past over drug debts. So he surely knew that it was reasonably foreseeable that even if they were just going to have a meeting about a, you know, to collect money, that Grigor could have killed somebody there. So I would submit, and the record shows- He didn't have to be certain. Excuse me? He didn't have to be certain. He did not at all have to be certain. That's the theory of the Pinkerton liability, Your Honor. All right. Thank you. Thank you, Your Honor. Mr. Mabula-Sanuma, you have three minutes to vote. Let me make three points and then we'll have to talk a little fast. So number one, counsel says, well, there's pros and cons to every decision in a trial. There's no con to investigating the case. There's no downside to that. They should have found out what Brittany was going to tell them, and they failed to do that. Number two, counsel points to page 1225 of the appendix for testimony from Anthony Rico about conversations about the spray bottle. It's deliberately vague testimony. The spray bottle came up because the FBI asked about it in the spring before Mr. Curtin was even represented in the federal case. And it was, as Mr. Curtin describes it, a pushy conversation where they pushed him to say there was a spray bottle there, whether it was his or Mr. Grigger's. So, yes, there were conversations. Any admission about the spray bottle would have come much, much later, and I would submit after the pro se statement, public statement contradicting it, and therefore is not particularly credible and should have still not barred further investigation. The third thing, I just want to address the count two and the Pinkerton situation. So it's true there's a lower standard of intent because there was a Pinkerton instruction, but there was an available defense that wasn't developed. Counsel said there's a coherent defense strategy. I'm sorry. I don't glean it from reading the closing or from reading the cross examinations, and I barely glean it from reading the government. I mean, the best version of it is the one the government articulates. I barely see it. I mean, what's said in the affidavits by the trial lawyer doesn't seem like any defense at all. I mean, in summation. Why isn't it a strategy? We've got to say Grigger is a liar and the case can't stand without his testimony. Why isn't that a reasonable strategy? They certainly tried to do that, right? They tried to say. The summation was on and on about how Grigger can't be believed, right? But they adopted most of what Grigger said, that Grigger pulled the trigger. I mean, they didn't really go after Grigger. They didn't use his proffers. They certainly made generalized attacks on his credibility, but they didn't attack the bad things he was saying about Curitin. That's the problem. When you look at that closing, there's no theory there. And so the defense to count two, which I think is so important, is that count two was narrowly drawn to this particular kilogram of cocaine that was provided to Brooks in the middle of September of 2009. And there was evidence in the record that Grigger had other motives that Curitin may or may not have known about, but that there was other conspiracies. So even accepting the generalized prior knowledge that gets the government over the hump in the Pinkerton instruction, there was a defense there. And they could have developed it with investigation. There was a drug dealer in Texas who said that Grigger admitted that he killed Brooks over $20,000 worth of marijuana. He didn't even ask the question. Isn't it true that he was- Wasn't that included in the charging language, that if it was over marijuana, it still could have resulted in a conviction? It wasn't, right? That was one of the drugs that was included in the indictment, right? Your Honor, we can't count on district judges to do our jobs. It should have been in the closing. He should have explained it meticulously in lay language, not in charging language, that if you believe that this was over the marijuana, then you have to acquit him. And there was no such explanation. I mean, you and I accept that after seeing, I hope, after spending time understanding the very, you know, it's difficult language in these statutes. The point of constitutional counsel is to explain that in closing and to present a coherent defense strategy. I'm not saying that they didn't come up with one after the fact. I'm saying that's hindsight and it's rationalization. There was no coherent summation. You can't, reading the summation, you can't understand it. I'll leave you with this. One of the first things he says is somebody always gets killed in drugs. And that's a concession of guilt. That's not constitutionally effective counsel. And if he hadn't conceded guilt, if he had done the investigation that was required and presented the fruits of those investigations, there is a reasonable probability that Mr. Jordan would have been acquitted on either count one or count two of those. All right, thank you. Thank you. Thank you. We'll reserve the decision. Have a good day.